# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

—oOo—

**FILED**

FEB 2 3 2012

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
          DEPUTY CLERK

UNITED STATES OF AMERICA

v.

JAMIR IMARI TATUM

**CRIMINAL COMPLAINT**

CASE NUMBER:

(Name and Address of Defendant)

2:12 - MJ - 54    KJN

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief, in San Joaquin County, in the Eastern District of California defendant did,

- **SEE ATTACHMENT A**

in violation of **Title 18, United States Code, Sections 1591(a)(1) and 2251(a)**, respectively. I further state that I am a Special Agent, assigned to the Federal Bureau of Investigation Innocence Lost Task Force, and that this complaint is based on the following facts:

- **SEE ATTACHED AFFIDAVIT**

**X** Continued on the attached sheet and made a part hereof.

Signature of Complainant MINERVA SHELTON
Special Agent
Federal Bureau of Investigation

Sworn to before me, and subscribed in my presence

February 23, 2012                   at    Sacramento, California

Date                                      City and State

KENDALL J. NEWMAN

United States Magistrate Judge

Name and Title of Judicial Officer        Signature of Judicial Officer

## ATTACHMENT A

- between on or about a date unknown to the Grand Jury, but no later than February 22, 2012, and on or about February 22, 2012, in the State and Eastern District of California, in and affecting interstate commerce, knowingly did recruit, entice, harbor, transport, provide, obtain, and maintain by any means, a person, to wit: a minor female victim identified as "P.H.," knowing that means of force, threats of force, fraud, coercion, and any combination of such means, would be used to cause the person to engage in a commercial sex act, and knowing that the person had not attained the age of 18 years and would be caused to engage in a commercial sex act, in violation of Title 18, United States Code, Section 1591(a)(1); and

- between a date unknown, but no later than February 22, 2012, and on or about February 22, 2012, in the State and Eastern District of California, knowingly employ, use, persuade, induce, entice, or coerce any minor to engage in, any sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct, knowing or having reason to know that the visual depiction would be transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed, that visual depiction was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer, or that the visual depiction was actually transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, all in violation of Title 18, United States Code, Section 2251(a).

# AFFIDAVIT IN SUPPORT OF ARREST WARRANT

I, MINERVA SHELTON, being duly sworn, depose and state:

## INTRODUCTION

1. I am a Special Agent of the Federal Bureau of Investigation (FBI), and have been so employed for ten years. I attended the FBI academy from January, 2002 to May, 2002. Prior to being employed by the FBI, I was employed by El Paso Police Department for five years. I attended the El Paso Police Academy from January, 1997 to May, 1997. I am currently assigned to the FBI's Sacramento Division and primarily investigate violent crimes. Since January, 2006, I have been primarily involved in the investigation of sexual exploitation of children (SEOC) in violation of federal law. I have attended numerous hours of instruction on child prostitution and the victims of such crimes. As a police officer, I interviewed numerous juveniles who were victims of sexual exploitation. During my tenure as a Special Agent, I have conducted and participated in numerous investigations involving juvenile prostitution and the sex trafficking of children.

2. As a federal agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States. This Affidavit is made in support of an application for an arrest warrant for JAMIR AMARI TATUM and DOB: 06/23/1992 (hereinafter "SUBJECT").

3. I believe that there is probable cause to believe that the SUBJECT has violated the following federal statutes:

   a. 18 U.S.C. § 1591, Sex Trafficking of Minor or by Force, Fraud, or Coercion, which makes it a crime to knowingly, in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, obtains, or maintains by any means a person; or benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described above, knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud,

1

coercion, or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act;

    b. 18 U.S.C. § 2252 (a) (4) (B), Possession of Child Pornography, which makes it a crime to knowingly possess matter containing any visual depiction that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce, or in or affecting interstate or foreign commerce, or which was produced using materials which have been mailed or so shipped or transported, by any means including by computer, if the production of such visual depiction involved the use of a minor engaging in sexually explicit conduct, and such visual depiction was of such conduct;

4. I am familiar with the information contained in this Affidavit based upon my experience and training, my conversations with other law enforcement officers who have engaged in numerous investigations involving child pornography, and the investigation I have conducted.

5. Because this Affidavit is being submitted for the limited purpose of securing an arrest warrant, I have not included each and every fact known to me concerning this investigation. I have not excluded any significant exculpatory evidence. I have set forth only those facts that I believe are necessary to establish probable cause to believe that the SUBJECT has violated 18 U.S.C. §§ 1591 and 2251. Where statements of others are set forth in this Affidavit, they are set forth in substance and in part.

## **DEFINITIONS**

1. "Child Pornography" includes the definition found at 18 U.S.C. § 2256(8), and is any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

2

2. As used in this affidavit, "child erotica" means materials or items that are sexually arousing to certain individuals but that are not in and of themselves obscene or do not necessarily depict minors in sexually explicit poses or positions. Such material may include non-sexually explicit photographs (such as minors depicted in undergarments in department store catalogs or advertising circulars), drawings, or sketches, written descriptions/stories, or journals.

3. "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image. See 18 U.S.C. § 2256(5).

4. "Minor" means any person under the age of eighteen years. See 18 U.S.C. § 2256(1).

5. "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, genital-anal, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any persons. See 18 U.S.C. § 2256(2).

**BACKGROUND ON PROSTITUTION AND THE USE OF THE INTERNET AND COMPUTERS TO FURTHER CHILD SEX TRAFFICKING**

1. Through my training and experience, I am aware of the following traits of prostitution and how the Internet is used to further the activities of illegal prostitution and Child sex trafficking:

    a. Individuals who, through enticement, intimidation, or force, enlist persons to become prostitutes, and who profit from the prostitution of others are called "pimps." Pimps are sometimes euphemistically referred to as "management.

    b. Pimps, as well as prostitutes who are not "managed," have embraced the Internet as a means of advertising services and communicating with customers.

3

c. Certain web sites have been created to facilitate communications between prostitutes and their clients. The more notable web sites relevant to prostitution in the Eastern District of California include *myredbook.com* and *backpage.com*. These web sites allow pictures to be posted as part of advertisements. I have viewed prostitution advertisements on each of these web sites.

d. Subjects utilize computers to access the Internet in order to post prostitution-related advertisements on websites such as *myredbook.com* and *backpage.com*, and often use photographs in the advertisements. These photographs often show a nude or semi-nude female. These females are, at times, under the age of 18 years old.

e. Digital evidence of the results of web browsing can often be found on the hard drive of a computer during a forensic examination. In addition, the dialog and image downloads created when corresponding via e-mail and instant message (IM) are generally stored in the hard drive of a computer until overwritten by other correspondence, and are usually retrievable during a forensic examination of the computer.

f. Advertisements for prostitutes often contain codes for the services provided. For example the term "w4m" means women for men. The term "in-calls only" generally means that the prostitute will be providing the location for the sexual transaction. The term "donation" is often used to mean the cost for the sexual transaction.

g. Pimps attempt to avoid the attention of law enforcement through the high level of anonymity provided by the Internet.

h. Most juvenile prostitutes have pimps. In some cases, prostitutes may have had several pimps during their time working. Prostitutes will often refuse to divulge the identity of their pimps to law enforcement, or may divulge the name of a former pimp in an attempt to placate or distract

4

law enforcement, while protecting the identity of their current pimp. Most pimps instruct the prostitutes on what to say and what not to say to law enforcement.

i. Prostitutes are instructed by the pimp regarding the ways to detect undercover officers. When arranging "dates" with clients over the phone, prostitutes rarely discuss the details pertaining to the sexual acts that are to occur, deferring such conversation until they meet the prospective client in person.

j. The pimps at times use physical force and/or fear to control the prostitutes. They control the prostitutes' actions, and collect monies earned through acts of prostitution. The pimps facilitate the prostitution by transporting the prostitutes to locations where the prostitution occurs. The pimps, at times, transport prostitutes across state lines for the purpose of prostitution.

k. Prostitutes and/or pimps often stay in motels and hotels while travelling. The prostitutes and pimps travel via rental vehicles, privately-owned vehicles, airplanes, or buses during their travels. The pimps utilize the monies earned during acts of prostitution to travel and purchase food, lodging, clothing and other items. Due to their portability and the frequent availability of internet Wi-Fi access at many locations, laptop computers are often used when pimps and prostitutes travel, to add and update online postings of prostitution-related advertisements.

l. Pimps often possess firearms to assist in protecting and controlling their prostitutes.

m. Pimps may sell drugs as another means to make money. The pimps often provide drugs to the prostitutes to suppress their appetites and to assist with the demands of prostituting for long periods of time.

n. The term "daddy" is commonly used by prostitutes when referring to their pimps. The pimp's phone number is often programmed as "daddy" in the prostitutes' cell phones.

5

o. Pimps often request or force their prostitutes to obtain tattoos of names and/or symbols that are related to the pimp's name or nickname. This is known as "branding."

p. Prostitutes utilize mobile (cell) phones as a way to be contacted by clients. These phone numbers are included in the advertisements that are posted on various prostitution-related websites. Contact is made through phone calls as well as text messages.

q. Pimps and their prostitutes communicate with each other through cell phones regarding prostitution activity. Communication is made through phone calls as well as text messages. In addition, many modern cell phones, known as "smartphones," have data-transmission capabilities that allow them to access the Internet. Such phones can be used to post and update online prostitution-related advertisements.

r. Pimps and prostitutes use personal e-mail accounts accessed through the Internet to post their advertisements on prostitution-related web sites.

**TOOLS OF THE INTERNET**

1. Based upon my knowledge, training, and experience in the Commercial Sexual Exploitation of Children (CSEC) and child pornography investigations, and the experience and training of other law enforcement officers with whom I have had discussions, I know that the development of computers, and other mobile devices such as cellular phones, and the Internet have revolutionized the way in which pimps interact with and sexually exploit children. Computers serve four basic functions in connection with child sex trafficking: production of advertisements, communication, distribution of advertisements, and storage. More specifically, the development of computers has changed the methods used by child sex traffickers in these ways:

    a. Child sex traffickers can now produce both still and moving images directly from a common video or digital camera. The camera is attached, using a device such as a cable, or digital images are often uploaded from the camera's memory card, directly to the computer. Images

6

can then be stored, manipulated, transferred, or printed directly from the computer. Images can be edited in ways similar to how a photograph may be altered. Images can be lightened, darkened, cropped, or otherwise manipulated. Child sex traffickers can also use a device known as a scanner to transfer photographs into a computer-readable format. As a result of this technology, it is relatively inexpensive and technically easy to produce, store, and distribute advertisements for trafficked children. Some of these advertisements meet the federal definition for child pornography. In addition, there is an added benefit to the child sex trafficker in that this method of production does not leave as large a trail for law enforcement to follow. In addition, due to their increased computing power, ability to access the Internet, and applications that are available at little to no cost, many of the production, editing, storage, and distribution techniques described above for computers can also be accomplished on a handheld cellular phone.

b. The Internet allows any computer to connect to another computer. By connecting to a host computer, electronic contact can be made to literally millions of computers around the world. A host computer is one that is attached to a network and serves many users. Host computers are sometimes operated by commercial ISPs, such as America Online, Inc., AT&T, and Comcast, to name a few, that allow subscribers to dial a local number and connect to a network that is, in turn, connected to the host systems. Host computers, including ISPs, allow e-mail service between their own subscribers and sometimes between their own subscribers and those of other networks. In addition, these ISPs act as a gateway for their subscribers to the Internet. Individuals who use the Internet can communicate electronically by using e-mail. E-mail messages can contain text, data, or graphic images. This type of communication is private in that it is directed from one Internet user to another. Child sex traffickers can also communicate and trade images of sex trafficking victims (including child pornography) using Instant Messaging. Instant Messaging is "real time" communication in that the persons communicating are engaging in an online dialog. This means of communication, like e-mail, is private in that it is one Internet user communicating specifically, and exclusively, with another. Only with careful laboratory examination of electronic storage devices is it possible

7

to recreate the evidence trail. Digital evidence of the results of web browsing can often be found on the hard drive of a computer during a forensic examination. In addition, the dialog and image downloads created when corresponding via e-mail and Instant Message are generally stored in the hard drive of a computer until overwritten by other correspondence, and are usually retrievable during a forensic examination of the computer.

c. The Internet allows child sex traffickers, while still maintaining perceived anonymity to (1) easily locate potential prostitution customers, and (2) recruit potential sex trafficking victims, both minors and adults. Child sex traffickers can use standard Internet connections, such as those provided by businesses, universities, and government agencies, to communicate with each other and to distribute prostitution advertisements. These communication links allow contacts around the world to be made as easily as calling next door. Additionally, these communications can be quick and relatively secure. Sometimes the only way to identify the child sex trafficker, the prostitution customer, and the victim, and verify the transportation of prostitution advertisements (including child pornography) over the Internet is to examine the pimp's computer, including the Internet history and cache, to look for "footprints" of the web sites and images accessed by the recipient.

d. A computer's capability to store images in digital form makes it an ideal repository for child sex traffickers. A single USB flash drive can store thousands of images and millions of pages of text. The size of the electronic storage media (commonly referred to as a hard drive) used in home computers has grown tremendously within the last several years. Hard drives with the capacity of 1 terabyte (1000 gigabytes) are not uncommon. These drives can store hundreds of thousands of images at very high resolution. Child sex traffickers use these images for online prostitution advertisements, and to send to potential customers interested in obtaining prostitution services.

/////
/////
/////

## PROBABLE CAUSE TO ARREST THE SUBJECT

1. On February 21, 2012, the Innocence Lost Task Force received information that a 14-year-old sex trafficking victim (hereinafter "Victim 1") was being posted on the prostitution-related website myredbook.com. The Task Force investigated the information and located Victim 1's advertisement on myredbook.com. The last advertisement observed by law enforcement was posted to myredbook.com on February 22, 2012, at 12:10 pm. The parents of Victim 1 also confirmed that the girl in the photographs was their daughter.

2. In the advertisement, Victim 1 is posted under the name "PassionPlush" and is reported to be in Stockton, California. The phone number connected with the advertisement is (510) xxx-2107. Victim 1's parents identified this phone number as belonging to the SUBJECT. The advertisement says that Victim 1 is available for "incalls" and "outcalls" in the Stockton area. Incalls and outcalls are prostitution-related terms that deal with the location that a date is to take place. During an incall, a John comes to the prostitute's location; during an outcall, the prostitution travels to the location of the date. The rate quoted for Victim 1's services is $100/hour.

3. Two of the three photographs in the advertisement, show the victim engaged in sexually-explicit conduct. Specifically, the photographs show Victim 1's genitalia. They are taken as Victim 1 lies on a bed with her head and shoulders facing upward, and her nude lower body turned to the side. The photograph is taken from the foot of the bed, and clearly shows Victim 1's buttocks and genitalia as she spreads her leg slightly.

4. On February 22, 2012, agents from the Innocence Lost Task Force contacted the phone number in Victim 1's myredbook.com advertisement. After a series of phone calls and text messages, a date between Victim 1 and an undercover agent (UC) was arranged. The date was to occur in Stockton, California, at an apartment that Victim 1 was staying at. During several of these phone calls, a male voice was heard in the background. In addition, on one occasion the call went to voicemail. The name on the voicemail was "Jamir."

5. Upon approaching the apartment, the UC and other agents saw Victim 1 standing alone on the street corner. Also seen in the area where Victim 1 was standing was the SUBJECT, as well as

another male (later identified as "NOEL COWARD") and an adult female. This male and female were talking to the SUBJECT.

6. Based upon these facts, the decision was made by law enforcement to rescue the victim. Upon exiting their vehicle and identifying themselves as law enforcement, the SUBJECT immediately began running from the scene. The SUBJECT jumped over several fences during his flight, and was ultimately located approximately 15 minutes later hiding in the yard of a commercial business approximately one block away from where he was originally seen. The SUBJECT voluntarily surrendered after being warned that a police dog was going to be set upon him.

7. Victim 1 was searched. An LG MyTouch cell phone was found in her boot. Victim 1 identified this phone as hers. A search of the phone found the text messages sent earlier that day by the UC to arrange the meeting with Victim 1. Also located on the phone were the photographs that were part of the myredbook.com advertisement. Finally, a video of the SUBJECT and Victim 1 having sex was found on the phone. Based upon my observation of portions of the video, the SUBJECT appears to be holding the camera and taking the video while he is engaged in intercourse with Victim 1. The focus of this video is the act of intercourse between the SUBJECT and Victim 1, and the video clearly depicts the SUBJECT having vaginal intercourse with Victim 1. In the video, Victim 1 is also seen trying to shield her face from the camera. A second video located on the cell phone was of the defendant threatening another female.

8. I interviewed Victim 1. She told me that the SUBJECT was her boyfriend; that he did not do anything wrong; and that he had been taking care of her since she ran away. Victim 1 said that she met the SUBJECT in January 2012. During this initial meeting, Victim 1 told the SUBJECT that she was 15 years old. According to Victim 1, the SUBJECT replied, "Damn, you're still a baby," or words to that effect. Victim 1 and the SUBJECT developed a sexual relationship. During one sexual encounter, the SUBJECT took Victim 1 to a Sacramento motel. According to Victim 1, the photographs posted to the myredbook.com advertisement were taken at that time.

9. Victim 1 said that the SUBJECT picked her up when she ran away on February 21, 2012. Victim 1 said that the SUBJECT took her to a house in Stockton. The following morning, the SUBJECT took Victim 1 to COWARD's apartment. While at COWARD's house, the SUBJECT and Victim

10

1 had sex. Victim 1 later confirmed that the sexually explicit video of her and the SUBJECT found on the SUBJECT's phone was of this encounter.

10. Victim 1 said that the SUBJECT posted the advertisements to myredbook.com. She said that she had had two dates on February 21, 2012. On February 22, 2012, she made approximately $100 prior to being recovered by law enforcement. All of the money made by Victim 1 while working as a prostitute went to the SUBJECT.

11. Victim 1 also said that the only date that she had on February 22, 2012 (during which she made the $100 identified above) took place in COWARD's apartment. When Victim 1 and the date walked into the apartment, COWARD was present. Victim 1 said that she told COWARD that she was out of condoms and that COWARD gave her one to use during the date. A used condom was later recovered from COWARD's apartment.

12. Law enforcement interviewed COWARD. Prior to this interview, COWARD was observed leaving his apartment with Victim 1's purse. During the interview, COWARD said that he allowed the SUBJECT and Victim 1 to stay at his apartment. In exchange, COWARD said that he received $30 from the SUBJECT.

13. The SUBJECT was advised of his Miranda rights and agreed to speak with law enforcement. The SUBJECT initially denied any involvement in prostitution. However, later in the interview, the SUBJECT said that Victim 1 was working as a prostitute when he first met her approximately three months prior. The SUBJECT ultimately admitted that he was the male voice that law enforcement heard in the background during their attempts to arrange a date with Victim 1. He said that he and Victim 1 were boyfriend and girlfriend. He also admitted to having sex with Victim 1. The SUBJECT also said that the phone in recovered from Victim 1 (which contained the sexually explicit images and video) belonged to him. He admitted to taking the sexually-explicit images of Victim 1, and confirmed that the location at which those photographs were taken was the motel identified by Victim 1. The SUBJECT denied posting Victim 1's prostitution advertisement on myredbook.com, saying that it was a girlfriend of another male who posted the advertisement. He also admitted to taking the sexually-explicit video of himself and Victim 1, and identified both himself and Victim 1 in the video. He said he thought that he had erased the video. The SUBJECT said that he thought Victim 1 was 17 years old. However, he also said that Victim

11

1's uncle had called him earlier that day and told him that Victim 1 was only 14 years old. The SUBJECT was emotional and was crying through much of the interview.

## CONCLUSION

1. Based upon the above information, there is probable cause to believe that the SUBJECT has violated 18 U.S.C. §§ 1591 and 2251, which, among other things, make it a federal crime for any person to knowingly sex traffick a minor, and produce visual depictions of minors engaged in sexually explicit conduct.

2. Based upon the foregoing, this Affiant respectfully requests that this Court issue an arrest warrant for the SUBJECT.

MINERVA SHELTON
Special Agent
Federal Bureau of Investigation
Sacramento Innocence Lost Task Force

Approved as to form.

KYLE REARDON
Assistant United States Attorney

Subscribed and sworn to before me this 23rd day of February 2012

KENDALL J. NEWMAN
United States Magistrate Judge
Eastern District of California
Sacramento, California

12